**SCOTT MARTIN,**

        **Plaintiff,**

**v.**                             **Case No: 8:17-cv-3056-02CPT**

**ALLSTATE PROPERTY AND**
**CASUALTY INSURANCE**
**COMPANY,**

        **Defendant.**

_____

## ORDER

This cause comes before the Court for consideration of the following: (1) Defendant's motion to exclude the opinions of Plaintiff's expert witness, Steven Rawls (Dkt. 46); (2) Plaintiff's response to the motion to exclude (Dkt. 55); (3) Defendant's motion for summary judgment (Dkt. 50) and materials in support (Dkts. 51-54); (4) the parties' joint stipulation of material facts (Dkt. 59); (5) Plaintiff's response to Defendant's motion for summary judgment (Dkt. 60); (6) Defendant's reply in support of its motion for summary judgment (Dkt. 67); (7) Plaintiff's motion for partial summary judgment (Dkt. 56); (8) Defendant's response to Plaintiff's motion for partial summary judgment (Dkt. 61); and (9)

Plaintiff's reply in support of its motion for partial summary judgment (Dkt. 67).[1]

For the reasons stated below, the Court grants Defendant's motion for summary judgment, denies Plaintiff's motion for partial summary judgment, and denies the motion to exclude as moot.

## I.     FACTS AND PROCEDURAL BACKGROUND

The material facts are not disputed.  Except where otherwise noted, this statement of facts is taken from the parties' joint stipulation of agreed material facts (Dkt. 59) and the statement of undisputed material facts in Plaintiff's motion for partial summary  judgment (Dkt. 56 at 2-9).

Defendant and Sengthong Liamsavay ("Defendant's insured" or "the insured") were parties to an automobile insurance policy.  Dkt. 56 at 2; Dkt. 56-1. The policy carried bodily injury limits of $50,000 per claim and $100,000 per accident.  *Id.*  On July 17, 2008, Defendant's insured was driving his automobile.  Dkt. 56 at 3 ¶ 2.  He struck Plaintiff—who is a police officer for the City of Pinellas Park ("City")—while Plaintiff was directing traffic at an intersection.  Dkt. 59 ¶ 1. Plaintiff testified at his deposition that he suffered serious injuries.  Dkt. 53

---

[1] Defendant also asked the Court to take judicial notice of what it described as "the standard release form provided by the Trial Lawyers Section of the Florida Bar."  Dkt. 26. Plaintiff responded in opposition.  Dkt. 28.  The Court finds it unnecessary to consider the release form.  Thus, the request to take judicial notice is denied as moot.

at 7.  Defendant received notice of the accident the same day and assigned adjuster Cynthia Fletcher to work on the file.  Dkt. 59 ¶ 2.

On July 18, 2008, Fletcher ordered the police report for the accident, located a newspaper article about the accident, and spoke with the insured.  *Id.* ¶ 3.  She also determined that Plaintiff had been admitted to Bayfront Hospital.  *Id.* ¶ 4.  She called the hospital and spoke to Plaintiff's wife.  *Id.*  She then called Plaintiff's employer (the police department) and spoke with "Kim," who was handling Plaintiff's worker's compensation claim.  *Id.*

On July 25, 2008, Fletcher obtained a statement from the insured about the accident.  *Id.* ¶ 5.  She sent letters to witnesses seeking additional information about the accident.  *Id.*; Dkt. 50-4.  The next day, she sent the insured a letter stating that the value of Plaintiff's bodily injury claims appeared to exceed the policy limits, the policy allowed for an attorney to be retained to defend the insured, the insured had the right to hire his own attorney, and Defendant would make every effort to settle the case within policy limits.  Dkt. 59 ¶ 6; Dkt. 50-8.  She also asked Defendant for authority to pay the $50,000 policy limits.  Dkt. 59 ¶ 7.

On July 29, 2008, Fletcher asked an investigator to hand deliver a copy of the insurance policy, a check made payable to Plaintiff for $50,000, and a release form that covered the claims of Plaintiff and his wife.  *Id.* ¶ 8; Dkt. 50-10.  Some

time between July 29 and August 5, 2008, Plaintiff and his wife gave the check to the City, which forwarded it to the Florida League of Cities (the worker's compensation carrier). *Id.* ¶ 9.

On August 6, 2008, the worker's compensation carrier advised Fletcher that it believed the settlement check should be applied to its worker's compensation lien, which should have been filed by that date. *Id.* ¶ 10. The worker's compensation carrier told Fletcher that it would investigate and get back in touch with Defendant. *Id.* On November 6, 2008, the worker's compensation carrier sent Defendant a letter asserting a lien of $89,062.69 and returning the settlement check. *Id.* ¶ 11. The worker's compensation carrier asked Defendant to get in touch to negotiate a lien settlement. *Id.*; Dkt. 50-13. On the same day, the worker's compensation carrier sent Plaintiff a letter stating that it had "the right to claim a workers' compensation lien against any third party liability settlement that he might receive from that party." Dkt. 59 ¶ 12; Dkt. 50-14. It also requested that Plaintiff acknowledge the letter and make contact to resolve the worker's compensation lien. *Id.*

On December 3, 2008, Fletcher heard back from the City. Dkt. 59 ¶ 14. The City advised that, when Plaintiff received the $50,000 settlement check, he called the City to ask what he should do with it and the City told him to send the check to the City because it was "not right" for him to keep it. *Id.* The same day,

Fletcher also retained attorney Tom Bopp to assist her in handling Plaintiff's claim. *Id.* ¶ 13.

Bopp then spoke to the worker's compensation carrier. *Id.* ¶ 15. On December 4, 2008, he sent the worker's compensation carrier a letter outlining the conversation. *Id.*; Dkt. 50-16. On December 8, 2008, the worker's compensation carrier contacted Bopp and said that Plaintiff was not ready to sign any releases regarding his claim. Dkt. 59 ¶ 16. It also advised that it wanted the entire $50,000 policy limits to apply toward its lien. *Id.* Bopp advised the worker's compensation carrier that it had to base its reimbursement on a percentage of the claim, but the carrier was unwilling to compromise. *Id.* On December 11, 2008, Bopp sent a letter to Plaintiff and his wife. *Id.* ¶ 17; Dkt. 50-18. He followed up with the worker's compensation carrier about the status of the lien on January 12, 2009 and was advised that the carrier had not communicated with Plaintiff and his wife. Dkt. 59 ¶ 18.

On March 27, 2009, Bopp contacted the worker's compensation carrier. *Id.* ¶ 19. On March 30, 2009, he sent a letter to Plaintiff and his wife telling them that the worker's compensation lien had to be resolved and asking them to get in touch to "advise what [Defendant] may do to assist you in bringing this matter to a final resolution." *Id.* ¶ 20; Dkt. 50-20.

On April 3, 2009, Fletcher sent a letter to Defendant's insured stating, "We sent the officer a check for your $50,000 policy limit coverage.  He held the check for several months, and then returned the check to us.  I have hired an attorney to handle the claim on our behalf.  The attorney sent another letter to the officer on March 30, 2009 again advising that we are offering our policy limit to the officer in exchange for a release for you."  Dkt. 59 ¶ 21; Dkt. 50-21.

On April 9, 2009, Eduardo Jimenez of the law firm Darrigo & Diaz sent a letter to Defendant advising that he represented Plaintiff.  Dkt. 59 ¶ 22.  The letter requested disclosures in accordance with Fla. Stat. § 627.4137, an affidavit from Defendant's insured and his insurance agent verifying that his automobile insurance policy with Defendant was the only policy available, and an affidavit from the insured confirming that he did not own any real property that was not protected as a homestead.  *Id.*; Dkt. 50-22.  The letter also stated:

> In order to resolve this claim amicably we will need the above information and documents provided to our offices by the end of this month.  If that occurs and if there is no real property owned by your insured(s) that is not homesteaded, my client will agree to resolve all his claims with your insured(s) in exchange for all applicable policy limits being tendered in my office by that time.  The checks shall be made payable to the trust account of Darrigo and Diaz for the benefit of [Plaintiff].  My client will resolve all current valid liens out of the proceeds of the settlement including liens for the worker's compensation carrier.  My client will sign a release for all his bodily injury claims but he cannot agree to a release containing a hold harmless or an indemnity agreement.  Also my client cannot agree to releasing anyone other than your insured(s).  Please understand that any attempt to provide a release that contains a hold harmless,

indemnity agreement or that releases anyone or entity other than your insured(s) or releases any other person or entity's claim other than my client's will be treated as a rejection of this good faith offer. So that I can do my job completely I must insist on strict performance with the terms of this offer. Partial performance or the promise to perform will not suffice. I look forward to your timely response by the end of the month . . . .

Dkt. 59 ¶ 22; Dkt. 50-22 at 1-2.

Defendant received the letter on April 13, 2009 (Dkt. 59 ¶ 23) and sent a copy to the insured the next day (*Id.* ¶ 24; Dkt. 50-23). Defendant also faxed a copy of the letter to Bopp so that he could assist with the response. Dkt. 59 ¶ 25; Dkt. 50-24.

On April 17, Defendant retained attorney Jeff Caglianone to help the insured with the requested affidavits. Dkt. 59 ¶ 26; Dkt. 50-25. On April 20, Bopp sent Caglianone a letter describing the information Defendant needed from the insured. Dkt. 59 ¶ 27; Dkt. 50-26. The letter noted that "it does not appear that [Jimenez] is allowing [Defendant] to include . . . [Plaintiff's] spouse, on the release or settlement draft." Dkt. 50-26 at 2. It also noted that Bopp was trying to confirm this and asked that Caglianone discuss the issue with the insured. *Id.* That day, Caglianone had a conference with the insured to begin obtaining the information necessary to respond to Jimenez's letter. Dkt. 59 ¶ 26.

On April 21, 2009, Bopp left two messages for Jimenez. *Id.* ¶ 28. He left another message for Jimenez on April 22. *Id.* ¶ 29. He also sent a letter to Ronald

Darrigo and Nadine Diaz at Darrigo & Diaz stating that "there are a few items I need to clarify regarding the demand that your office presented on behalf of [Plaintiff]." *Id.*; Dkt. 50-28. On April 22, Bopp also contacted the insured's insurance agent and requested an affidavit confirming that the insured did not have any additional coverage. Dkt. 59 ¶ 30; Dkt. 50-29.

On April 24, 2009, a paralegal at Jimenez's firm wrote to Bopp. Dkt. 59 ¶ 31. She acknowledged receipt of the April 22 letter, advised that both Darrigo and Diaz were out of the office, and asked Bopp to tell her what information needed to be relayed to them. *Id.*; Dkt. 50-31.

On April 28, 2009, Bopp wrote Jimenez and ask whether "the demand on behalf of [Plaintiff would] include resolution of the potential consortium claim." Dkt. 59 ¶ 32; Dkt. 50-32. The next day, Jimenez responded by stating, "[O]ur demand is only for our client's claim." Dkt. 59 ¶ 33; Dkt. 50-33. On April 30, 2009, Bopp hand delivered a letter to Jimenez. Dkt. 59 ¶ 34. The letter included a settlement check, a proposed release, an affidavit from the insured regarding other insurance coverage and real property he owned, an affidavit from the insured's insurance agent, and a "limits of insurance affidavit" from Defendant. *Id.* ¶ 34; Dkt. 50-34. The release provided, in relevant part:

> I, [Plaintiff] . . . , for myself, my heirs, my personal representatives, successors and assigns fully acquit, release and forever discharge [Defendant's insured] from any and all claims . . . which I may have had, may now have, or may hereafter have because of or arising out of

> bodily injuries sustained by me as a result of an accident that occurred
> on or about the 17th day of July, 2008 in Pinellas County, Florida.

Dkt. 50-34 at 3.  Bopp's enclosure letter stated, "Should you have any questions about any aspect of the release terms, please call me immediately.  You may also send me any suggested changes, additions or deletions . . . ; or if you have a release that you desire to use, please forward it to me."  *Id.* at 2.

A week later, on May 7, 2009, Jimenez wrote Bopp stating that he was "surprised and dismayed" that Bopp attempted to "settle claims of other persons or entities other than [Plaintiff] when doing so was a rejection of our good faith offer" because the release included the language "for himself, his heirs, his personal representatives, his successors, and his assigns."  Dkt. 59 ¶ 35; Dkt. 50-35.  Jimenez advised that Plaintiff had instructed him to move forward with a lawsuit for the full value of Plaintiff's loss.  *Id.*  On May 18, Bopp responded.  Dkt. 59 ¶ 36.  He noted that Plaintiff did not have the power to release the claims or other persons or entities and the proposed release applied only to Plaintiff's bodily injury claim.  *Id.* ¶ 36; Dkt. 50-36.  He offered to remove the objectionable language.  *Id.* Alternatively, he suggested that Jimenez scratch out the problematic language.  *Id.* The record does not show that Jimenez responded to Bopp's letter.

On July 1, 2009, Plaintiff filed suit in state court.  Dkt. 56 at 8 ¶ 29. Defendant hired attorney Sid Crawford to defend Defendant's insured.  Dkt. 59 ¶ 37.  In his answer to the state court lawsuit, Defendant's insured (through counsel)

asserted the following as his third affirmative defense: "[T]he action was barred by virtue of settlement. The plaintiff offered to settle and the defendant accepted and there is, therefore, a binding settlement." Dkt. 56 at 8 ¶ 30. Defendant's insured (through counsel) also drafted a motion to enforce settlement, arguing that Jimenez's April 9 settlement offer was accepted by Defendant. *Id.* ¶ 31. Plaintiff filed a motion for partial summary judgment as to the insured's third affirmative defense. *Id.* After that motion was filed, Defendant's insured (through counsel) withdrew the third affirmative defense with prejudice. *Id.* at 9 ¶ 32. The state court lawsuit was resolved by consent judgment against Defendant's insured (*id.* ¶ 34), and a final judgment was entered in favor of Plaintiff on March 20, 2013, in the amount of $1,500,000 (Dkt. 59 ¶ 38).

Plaintiff then filed suit in state court against Defendant. Dkt. 2. In his complaint, he brought a third-party bad faith claim against Defendant, alleging that Defendant engaged in bad faith when it responded to Plaintiff's April 9 settlement offer by offering a "release which would have released the claims of persons or entities other than [Plaintiff]," thereby "failing to promptly settle the claims against [Defendant's insured] within the Policy's limits when it could and should have done so." *Id.* ¶¶ 14, 26. Defendant removed the action to this Court, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Dkt. 1.

Defendant has now moved for summary judgment.  Dkt. 50.  Plaintiff has also moved for partial summary judgment, asserting that Plaintiff "is entitled to partial summary judgment finding that [Defendant] could have settled his claims against [Defendant's insured] for the policy's limits" and that Defendant "should be foreclosed from asserting a defense of unwillingness to settle."  Dkt. 56 at 18.

## II.  <u>STANDARD OF REVIEW</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant does so, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).  To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## III.  ANALYSIS

### A.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment, asserting that it is entitled to a finding that Defendant could have settled Plaintiff's claims against Defendant's insured for the policy's limits and that Defendant "should be foreclosed from asserting a defense of unwillingness to settle." Dkt. 56 at 18. Plaintiff also claims that Defendant "must be barred from raising any defense that it complied with the terms of Plaintiff's offer . . . ." *Id.* at 1. Most of Plaintiff's arguments are subsumed in the Court's discussion of Defendant's motion for summary judgment, *infra*. Notably, however, the Court need not decide whether Defendant "could

have" settled Plaintiff's claims because, even if the Court assumes that the claims could have been settled, there is no evidence that Defendant engaged in bad faith.

Plaintiff also makes a collateral estoppel argument.[2]  Specifically, Plaintiff argues that "the issue of whether [Defendant] could have settled Plaintiff's claims was determined in the Underlying Lawsuit" when Defendant's insured withdrew his affirmative defense of settlement and that the doctrine of collateral estoppel bars Defendant from arguing otherwise. *Id.* at 15-16.  To the extent that Plaintiff is suggesting that collateral estoppel prevents Defendant from arguing that "it complied with the terms of [Plaintiff's] offer" (*id.* at 1), the Court rejects that argument.

Collateral estoppel applies if: "1) an identical issue; 2) has been fully litigated; 3) by the same parties or their privies, and 4) a final decision has been rendered by a court of competent jurisdiction." *Gilliard v. Athena Funding Grp., Inc.*, No. 8:11-cv-1563-T-17EAJ, 2013 WL 877104, at *5 (M.D. Fla. Mar. 8, 2013) (citation omitted).  Plaintiff has not explained how most of these elements apply to the facts of this case.  Even assuming, however, that Defendant and its insured are, as Plaintiff argues, privies for these purposes and that the insured's withdrawal of

---

[2] Plaintiff also mentions *res judicata* (Dkt.  56 at 15), but he does not make any argument that *res judicata* applies in this case, instead focusing his argument on collateral estoppel. *See, e.g.*, Dkt. 56 at 14 ("The principles of estoppel prohibit [Defendant] from litigating this issue . . . ."); *id.* at 15 ("Florida law is clear that the doctrine of collateral estoppel applies . . . ."); Dkt. 66 (not mentioning *res judicata*).

an affirmative defense with prejudice amounts to a final decision from the state court (a proposition for which Plaintiff provides no support), Plaintiff's argument still fails.

The issue—if any—"decided" when the insured withdrew its affirmative defense is not the same as the issue presented in this Court. In the underlying litigation, the insured asserted that Plaintiff had settled his claims. Consideration of that defense would have required the state court to determine whether Defendant's April 30 response to Jimenez's April 9 settlement offer constituted an acceptance of the offer or whether the "heirs, personal representatives, successors, and assigns" language in the proposed release converted it into a counteroffer under the "mirror image rule." No such issue is presented by this litigation. Instead, the question is whether Defendant "fail[ed] to settle a claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward [its insured] and with due regard for [his] interests." Fla. Standard Jury Instruction 404.4, Insurer's Bad Faith (Failure to Settle), *available at* https://jury.flcourts.org/civil-jury-instructions-home/civil-instructions/#404 (last visited Feb. 28, 2019). In this case, as discussed below, the Court need not decide whether the parties actually settled Plaintiff's claim under Florida's "mirror image rule." Thus, the doctrine of collateral estoppel does not apply.

**B.      Defendant's Motion for Summary Judgment**

      1.      <u>Legal Standard for  Bad Faith Claim</u>

In this case, Plaintiff pursues a third-party claim for bad faith failure to

settle.  The parties agree that Florida law governs this diversity case.

Under Florida law, "in handling the defense of claims against its insured, [an

insurer] has a duty to use the same degree of care and diligence as a person of

ordinary care and prudence should exercise in the management of his own

business." *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla.

1980) (citation omitted).  A breach of this duty can give rise to a cause of action

for bad faith.  *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 898 (Fla. 2010).  In

Florida, an injured third party—such as Plaintiff—may maintain a bad faith claim

directly against an insurer.  *Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 455

(Fla. 2006).

The duty of good faith requires the insurer to "advise the insured of

settlement opportunities, to advise as to the probable outcome of litigation, to warn

of the possibility of an excess judgment, and to advise the insured of any steps he

might take to avoid same." *Boston Old Colony*, 386 So. 2d at 785 (citation

omitted).  The insurer must "investigate the facts, give fair consideration to a

settlement offer that is not unreasonable under the facts, and settle, if possible,

where a reasonably prudent person, faced with the prospect of paying the total

recovery, would do so." *Id.* The duty of good faith requires an insurer to exercise control over the handling of claims and make decisions in good faith and with due regard for the interests of the insured. *Id.* An insurer must refrain from acting in its own interests. *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018) (citation omitted). It also must act with care and diligence. *Id.*

The critical question in a bad faith action "is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* "'Good faith' generally means that an insurer must reasonably act in the best interests of its insured." *Hinson v. Titan Ins. Co.*, 656 F. App'x 482, 485 (11th Cir. 2016) (citing *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 677 (Fla. 2004)).[3] An insurer breaches the duty of good faith "when it acts in a way that unreasonably fails to mitigate or unreasonably exacerbates the insured's exposure to liability." *Maharaj v. GEICO Cas. Co.*, 996 F. Supp. 2d 1303, 1310 (S.D. Fla. 2014) (quoting *Valle v. State Farm Mut. Auto. Ins. Co.*, 394 F. App'x 555, 556 (11th Cir. 2010)).

Courts use a "totality of the circumstances" standard to determine whether an insurer has acted in bad faith. *Harvey*, 259 So. 3d at 7 (citation omitted). "[N]egligence is relevant to the question of good faith." *Boston Old Colony*, 386

---

[3] In this Order, unpublished cases of the Eleventh Circuit are cited as persuasive authority.

So. 2d at 785.  However, the standard of liability is bad faith, not negligence, *Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974); *see also Harvey*, 259 So. 3d at 9 ("[I]t is true that negligence is not the standard.").  In addition, in a case where "liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations."  *Harvey*, 259 So. 3d at 7 (quoting *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991)).

The damages claimed in a bad faith case must be caused by the insurer's bad faith.  *Id.* (citation omitted).  The "focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured."  *Berges*, 896 So. 2d at 677.

Ordinarily, determining whether an insured acted in bad faith is a jury question.  *See id.* at 680.  However, courts applying Florida law have granted summary judgment on bad faith claims in appropriate cases.  *See, e.g.*, *Valle*, 394 F. App'x at  557.[4]

---

[4] On this point, the Court notes that the Florida Supreme Court has observed that "[t]o the extent that the federal cases permit summary judgment based on Federal Rule of Civil Procedure 56 . . . they are of limited precedential value in Florida [state court] summary judgment cases because Florida places a higher burden on a party moving for summary judgment in state court." *Harvey*, 259 So. 3d at 10 n.2 (internal quotation and citation omitted).  Thus, to the extent Plaintiff relies on state court cases denying summary judgment, those cases are not necessarily on point.

2.   Application

Upon consideration, the Court concludes that there is no evidence from which a jury could infer that Defendant breached the duty of good faith and unreasonably exposed its insured to excess liability. Within two weeks of the accident, Defendant had tendered the policy limits (Dkt. 59 ¶¶ 7-8) and informed its insured of the possibility of an excess judgment and his right to hire his own attorney (*id.* ¶ 6). It then communicated with the worker's compensation carrier. *Id.* ¶¶ 10-20. It also attempted to clear up the road block caused by the carrier's assertion of a lien and refusal to compromise on the amount of the insurance proceeds to be applied to the lien. *Id.* When Plaintiff's attorney made a settlement demand, Defendant acted expeditiously and worked diligently with its insured to obtain all the documents and information requested by the April 30 deadline. *Id.* ¶¶ 22-34. When Plaintiff's attorney quibbled with the wording of Defendant's proposed release, Defendant offered to fix the language. *Id.* ¶¶ 35-36. Plaintiff's attorney did not respond to that offer but instead filed suit approximately six weeks later. Dkt. 56 at 8 ¶ 29. Considering the totality of the circumstances, Defendant acted with good faith and with due regard for the interests of its insured.

Plaintiff argues[5] that Defendant breached the duty of good faith when it "reject[ed]" Plaintiff's April 9 settlement offer and instead proffered a proposed release with "offending language" that was not a "mirror image" of the settlement offer. Dkt. 60 at 10, 12. According to Plaintiff, Defendant overreached when it proposed a release that released "any and all claims . . . which I may have had" for Plaintiff, "[his] heirs, [his] personal representatives, successors and assigns." Dkt. 50-34 at 3. This argument misses the mark both factually and legally.

Factually, Plaintiff is incorrect that Defendant overreached. The demand letter stated that "any attempt to provide a release that . . . releases any other person or entity's claim other than my client's [would] be treated as a rejection . . . ." Dkt. 50-22 at 22. Defendant did not provide a release that released any other person or entity's claim. It provided a release that released only claims that *Plaintiff* may have had. Dkt. 50-34 at 3. The fact that Plaintiff was being asked to release his claims on behalf of himself, his heirs, his personal representatives, and his

---

[5] Plaintiff also makes a secondary argument labeled, "The Focus of this Bad Faith Case is on [Defendant's] Actions, not [Plaintiff] and his Attorneys." Dkt. 60 at 15-19. It is unclear what, if anything, Plaintiff is arguing in this section, which consists mainly of Plaintiff's re-recitation of the facts (from his perspective). To the extent this section constitutes an argument that the Court should focus on Defendant's actions, the Court notes that it has focused its bad faith analysis on Defendant's actions, not those of Plaintiff and his attorney. Thus, the Court need not reach any factual conflicts about the communications between Plaintiff's attorney and Defendant's attorney. And, to the extent that Plaintiff argues that any of Defendant's pre-April 9, 2009 conduct mentioned in this section supports a finding of bad faith, Plaintiff has failed to explain how any of that conduct contributed to the failure of this case to settle when it could have and should have, thereby causing damages.

successors and assigns does not transform the proposed release into a release of any claims those persons or entities might have.[6] Plaintiff's attorney's quibbles with the proposed release language do not change the fact that Defendant gave Plaintiff what he asked for—a release of only his claims.[7]

Legally, Plaintiff's reliance on cases where insurers proposed overbroad releases is also misplaced. *See* Dkt. 60 at 11-14, 20. Plaintiff's cases are distinguishable. In each of the cases, the insurance company proposed a broad release that went beyond releasing the injured party's claims against the insured and instead required the injured party to indemnify and hold harmless the insurance company; released claims against the insurance company and others; or both.[8] In one of the cases, the insurer proposed an indemnification and hold

---

[6] Notably, Defendant's proposed release would not—as Jimenez suggested in his May 7 letter (Dkt. 50-35)—have released any claims (including any loss of consortium claim) that Plaintiff's wife had against Defendant's insured. Plaintiff's wife is not his heir, personal representative, successor, or assign and—in any event—her loss of consortium claim is not a claim that Plaintiff "may have had."

[7] For this reason, Defendant's failure to review the release drafted by its attorney prior to tender (*see* Dkt. 60 at 9) is immaterial.

[8] *See United Auto. Ins. Co. v. Estate of Levine ex rel. Howard*, 87 So. 3d 782, 784 n.2 (Fla. 3d DCA 2011) (insurance company proposed that the injured party's estate execute a release that released the insured, the insurance company, and (arguably) everyone in the world from claims related to the accident at issue and required the injured party's estate to indemnify and hold harmless the insurance company as to a number of claims and liens, including "any and all other Insurer's claims or subrogated liens"); *Maharaj v. GEICO Cas. Co.*, No. 9:12-cv-80582-KAM, Dkt. 42-11 and 996 F. Supp. 2d 1303, 1305-08 (S.D. Fla. 2014) (insurance company proposed release that required injured party to indemnify and hold harmless "Releasees," which included the insurance company); *Gov't Emps. Ins. Co. v. Prushansky*, No. 9:12-cv-80556-KAM, Dkt. 71 ¶¶ 32-33; Dkt. 71-3; and 2014 WL 47734, at \*4-5 & n.4 (S.D. Fla. Jan. 7, 2014) (insurance company proposed release that required injured party to indemnify and hold harmless "Releasee(s)," which included insurance company); *Turner v. Geico Indem. Co.*, No. 11-20546-CIV-MARTINEZ-MCALILEY, 2011 WL 13223665, at \*2-5 (S.D. Fla. Oct.

harmless agreement despite being told by the injured party's attorney that such a term was not acceptable.[9]  And in two of the other cases, there was evidence that the insurer refused to remove an indemnification and hold harmless agreement after being asked to do so.[10]

This case presents no such facts.  Just as Plaintiff's attorney asked, Defendant proposed a release that applied only to claims against Defendant's insured, did not include an indemnification or hold harmless agreement, and limited itself to releasing Plaintiff's claims.  Dkt. 50-34 at 3.  And when Plaintiff's attorney took issue with the release language, Defendant's attorney offered to fix it.  Dkt. 50-36.  It is true that an attempt to impose "overreaching requirements in the language of a release and other settlement terms" can support a finding of bad faith under a totality of the circumstances analysis, *Otaola v. Cusano's Italian Bakery*, 103 So. 3d 993, 997 (Fla. 3d DCA 2012), but Defendant engaged in no such overreach here.

4, 2011) (insurance company proposed release that required injured party to "indemnify and save harmless" the insured, the insurance company, and a host of others "from any and every claim or demand of every kind or character arising from said accident which may never be asserted" and also released everyone in the world from claims "on account of or in any way growing out of any and all personal injuries, property damage, and consequences thereof"); *Kemm v. Allstate Prop. & Cas. Ins. Co.*, No. 8:08-cv-0299-T-EAJ, 2010 WL 11507352, at *2 (M.D. Fla. Feb. 12, 2010) (insurance company proposed release that required injured party to indemnify and hold harmless the insureds and the insurance company from any liens).

[9] *Turner*, 2011 WL 13223665, at *2-3.

[10] *Prushansky*, 2014 WL 47734, at *6; *Maharaj*, 996 F. Supp. 2d at 1308.

Plaintiff's reliance on "mirror image" rule cases is also misplaced. Dkt. 56 at 12-13; Dkt. 60 at 12. In the cases Plaintiff cites, the insurance company responded to a settlement offer with a proposed release that included a term that the offer explicitly stated was unacceptable. The injured party then filed suit against the tortfeasor, who, in turn, attempted to rely on the settlement of the claim as an affirmative defense or to enforce the parties' purported settlement. In each of the cases, the appellate court found that there was no settlement because the response failed to mirror the offer, thereby converting the response into a counteroffer, not an acceptance.[11]

These cases are inapposite. They considered only whether there was an enforceable settlement agreement under the "mirror image" rule. They did not consider whether the insurer's failure to provide a "mirror image" response amounted to bad faith. Moreover, the Court need not delve into the details of a "mirror image" analysis in this case. For purposes of the bad faith analysis, it does

---

[11] *See Pena v. Fox*, 198 So. 3d 61, 62-64 (Fla. 2d DCA 2015) (injured party's counsel made settlement offer providing that injured party would not release any claim other than her claim against the insured, but the insurance company responded with a proposed release that released "Releasee(s), its agents, and employees"); *Villareal v. Eres*, 128 So. 3d 93, 96-100 (Fla. 2d DCA 2013) (injured parties' attorney made a settlement demand to the tortfeasor's insurance company, noting that his clients could not agree to a release with a hold harmless or indemnity agreement in it, but the insurance company responded with a proposed release including language that amounted to a hold harmless or indemnity agreement); *Gonzalez v. Claywell*, 24 So. 3d 1260, 1260-62 (Fla. 1st DCA 2009) (injured party's attorney offered to settle claims and stated that injured party would only sign a release form that "release[d] only [the tortfeasor] and the co-owners of the vehicle he was driving and does not include any indemnification language," but insurance company responded with a release that required the injured party to release the insurance company as well).

not matter whether the parties had an enforceable settlement agreement under Florida law. It is enough that Defendant acted reasonably and gave Plaintiff what he apparently asked for—a release that released only his claims. Notably, an insurer does not necessarily commit bad faith simply because it fails to provide a perfect "mirror image" of a settlement demand. *See, e.g.*, *Cardenas v. Geico Cas. Co.*, 760 F. Supp. 2d 1305, 1307, 1309-10 (M.D. Fla. 2011) (granting defendant's motion for summary judgment as to bad faith claim; finding that insurer did not act solely in its own interest in trying to settle a claim even though it provided a proposed release that included a hold harmless provision after claimant's attorney made a settlement offer that provided that a hold harmless agreement was not acceptable; and rejecting argument that summary judgment should be denied because insurer could have settled the claim by providing a "mirror-image" acceptance of the settlement offer).

In sum, the material facts are undisputed. The Court has considered the totality of the evidence and concludes that no reasonable jury could find that Defendant acted in bad faith. To the contrary, the record reveals that it acted in good faith and with due regard for the interests of its insured. When Plaintiff made a settlement demand, Defendant worked diligently and responded appropriately to the demand. Its actions did not unreasonably fail to mitigate or exacerbate its insured's exposure to liability. Instead, Defendant's proposed release met

Plaintiff's request for a release of only his claims.  As it happened, Plaintiff refused to sign the proposed release and instead filed suit.  But, under the totality of the circumstances in this case, the mere failure to settle does not, as Plaintiff contends, mean that Defendant "dropped the ball" in handling its insured's claim or engaged in bad faith.  Accordingly, Defendant's motion for summary judgment is due to be granted.

### C.      Defendant's Motion to Exclude the Opinions of Plaintiff's Expert

Defendant also moves to exclude the opinions of Plaintiff's expert, Steven Rawls.  Dkt. 46.  Plaintiff did not rely on the expert's testimony in his summary judgment briefing, and the Court has concluded that Defendant's motion for summary judgment is due to be granted.  Thus, the motion to exclude the expert's opinions is moot.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment (Dkt. 50) is granted, Plaintiff's motion for partial summary judgment (Dkt. 56) is denied, and Defendant's motion to exclude the opinions of Plaintiff's expert (Dkt.

46) is denied as moot.  The Clerk is directed to enter judgment for Defendant and close the file.

DONE and ORDERED in Tampa, Florida on March 1, 2019.


/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record